# United States Court of Appeals

## For the First Circuit

No. 03-1519

ROBERT R. BELLVILLE, TINA BELLVILLE, W. RONALD SHILALE, BEVERLY
SHILALE, AND LAMPREY ASSOCIATES, INC.,

Plaintiffs, Appellants,

v.

TOWN OF NORTHBORO AND WILLIAM LYVER, JR.,

Defendants, Appellees,

3COM CORPORATION, D/B/A STARTEK, DOYLE BRADLEY MINNIS, AND JOHN
POWERS,

Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

Scott S. Sinrich, with whom Phillips, Silver, Talman, Aframe,
& Sinrich, P.C. was on brief, for Appellants.

Deidre Brennan Regan, with whom Leonard H. Kesten and Brody,
Hardoon, Perkins & Kesten, LLP, were on brief, for Appellees.

July 9, 2004

**LIPEZ**, **Circuit Judge**.    On multiple grounds, the plaintiffs in this section 1983 case seek damages from a town and one of its police officers because of a search of their office, a home, and a truck, conducted as part of a police investigation of the theft of electronic materials from an electronics manufacturing company.  The district court adopted without comment the magistrate judge's report and recommendation to grant summary judgment to the defendants on all claims.  On appeal, all but two of the appellants' challenges to the district court ruling are either waived due to the appellants' failure to object properly to the magistrate judge's report, or are so lacking in merit that we can summarily affirm the district court opinion.

The two claims that require our attention involve the use of civilians by the police to execute a search warrant.  The district court found that the police officer in charge of the search, Sergeant William Lyver, Jr., "violated the Plaintiffs' Fourth Amendment right to privacy by failing to obtain the clerk-magistrate's approval to utilize civilian's [sic] in conducting the searches and by not adequately limiting the role played by the civilians in the searches."  Despite the finding of a constitutional violation, the district court found that the officer was entitled to qualified immunity because the limitations on civilian involvement at the time of the alleged violation were not clearly established.  Concluding that there was no violation of the

plaintiffs' Fourth Amendment rights at all, we affirm on a different ground.

## I.

We draw the following recitation of facts from the summary judgment record. Plaintiffs Robert Bellville and Ron Shilale managed the manufacturing department of Star-Tek, an electronics company, when it was acquired by the 3-Com Corporation in 1993. 3-Com decided to outsource its manufacturing operations after the acquisition and contracted with a company called Axcess, Inc. to find subcontractors. Learning of this development, Bellville and Shilale decided to exploit the knowledge and expertise that they had developed at Star-Tek by starting a company called Lamprey Associates to place bids with Axcess for the 3-Com contracts. They were still employed by 3-Com when they started Lamprey and were subject to Star-Tek's non-compete/non-disclosure agreement, but they recruited engineers and coworkers to work at Lamprey after hours. The company remained in existence for approximately one year, during which time it manufactured cables and networking equipment for 3-Com and other companies.

On July 15, 1994, a 3-Com employee named Sivan Hem disclosed the connection between Bellville, Shilale, and Lamprey to company officials and said that Bellville had stolen computer chips and equipment from 3-Com to use at Lamprey. She also said that he had altered inventory records to cover up these thefts. Four days

later, 3-Com contacted the Northborough Police Department regarding Hem's allegations, and Sergeant William Lyver began an investigation. Brad Minnis, a 3-Com security officer, conducted a parallel internal investigation.

Shilale learned of the 3-Com investigation when he discovered a note about the investigation on a copying machine at 3-Com and told Bellville that the company suspected them of theft. On the morning of July 25, Bellville called John Powers, Director of Manufacturing for 3-Com's Star-Tek division, and denied the accusations. Powers spoke with Minnis later that morning and recounted his conversation with Bellville. Minnis then contacted Sergeant Lyver for an update on the police investigation and told him that Bellville was aware of the investigation.

Sergeant Lyver obtained warrants to search Bellville's home and car, and Lamprey's office, later that day. He stated in the warrant affidavit that he expected to find the following stolen items during the search: a copying machine, twisted pair cable analyzers and similar devices, proprietary Star-Tek/3-Com documents, black boxes for storing circuit boards, computer chips, telephone/computer interfacing equipment, electronic or paper records, proprietary Star-Tek trade and manufacturing technologies, and at least one personal computer. Since he was not familiar with computers and electronic equipment and needed help identifying 3-Com property, Sergeant Lyver asked Powers and Minnis to accompany

-4-

him as he executed the warrant. The town's chief of police concurred with this decision; however, Lyver did not get permission from the state magistrate to include the civilians in the search. The group searched Lamprey's office on July 25 and searched Bellville's home and truck the next day.

Powers and Minnis actively assisted Sergeant Lyver with the search at Lamprey's office. They opened cabinets and drawers, reviewed documents, and identified 3-Com property. Minnis also searched Bellville's home office and accessed Bellville's home computer. He was alone for approximately one hour during this search while Sergeant Lyver was questioning Bellville outside.[1] Mrs. Bellville was in a room adjacent to the office and occasionally looked in to check on Minnis. Lyver recovered a large amount of property that he believed to be stolen from 3-Com during

---

[1]The accounts of the parties differ sharply on the details of Minnis' search of Bellville's home office. Sergeant Lyver and Minnis claim that Lyver was only outside for ten to thirty minutes and Minnis claims that he remained in the kitchen with Mrs. Bellville during that time. Bellville claims that his conversation with Sergeant Lyver lasted thirty to forty-five minutes and that "Minnis had been taking apart computers that I had." Mrs. Bellville claims that Minnis was alone in the office for forty-five minutes to an hour and that "every ten minutes [she] would get up and walk by briefly to see what he was doing." She further claims that she saw Minnis "going through paperwork, going through [her] husband's file cabinets, looking through books, doing something on his computer, accessing it, looking at serial numbers and turning it over and stuff like that." Since we must view the facts on summary judgment in the light most favorable to the non-moving party, we will assume that Minnis was alone in the home office for one hour. We will also accept Mrs. Bellville's version of Minnis' search of that office.

these searches, including product schematics, customer lists, cables and other computer components. His criminal investigation and the 3-Com internal investigation indicated that much of this material had indeed belonged to 3-Com. Sergeant Lyver later turned some of the seized items over to 3-Com.

Bellville and Shilale were fired for "gross misconduct" on August 1, 1994, and a grand jury indicted them for larceny and conspiracy to commit larceny in March 1995. Their wives were also indicted for conspiracy. The state court later dismissed the criminal charges against all four.[2]

The Bellvilles and Shilales responded to the dismissals by filing civil suits in state court against Sergeant Lyver, the Town of Northborough, Minnis, Powers, and 3-Com. The complaint raised section 1983,[3] Massachusetts Civil Rights Act ("MCRA"), negligent or intentional infliction of emotional distress, and loss of consortium claims against Lyver and Northborough. It raised malicious prosecution, MCRA, malicious abuse of process, wrongful termination, tortious interference with contract, Chapter 93A (the Massachusetts Consumer Protection Act), intentional infliction of

---

[2]The record does not disclose why the court dismissed the criminal charges.

[3]Section 1983 provides a private right of action against "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]" 42 U.S.C. § 1983.

emotional distress, conversion, loss of consortium, and section 1983 claims against 3-Com and its employees. The defendants removed the case to the United States District Court for the District of Massachusetts and moved for dismissal. The court denied that motion, and the parties initiated a long and contentious discovery period.

The defendants filed for summary judgment in January 2002; the court referred that motion to Magistrate Judge Swartwood for a report and recommendation. On February 24, 2003, the magistrate judge issued a meticulous fifty page report analyzing the appellants' numerous claims and recommending that the motion be granted. Despite the constitutional violation finding relating to the involvement of civilians in the searches, he recommended summary judgment on all of the appellants' section 1983 claims because he concluded that Sergeant Lyver was entitled to qualified immunity. His report advised the parties that they had to file written objections which "specifically identify the portion of the . . . report to which objection is made and the basis of such objection" if they wanted to appeal any of his recommendations or conclusions to the First Circuit. After the appellants objected with minimal specificity to portions of that report, the district court overruled those objections, adopted the report, and granted summary judgment on March 26, 2003.

The Bellvilles and Shilales appealed the judgment pertaining to Lyver and Northborough; however, they did not appeal the judgment pertaining to the 3-Com defendants. As noted, we will only discuss the appellants' claims regarding Sergeant Lyver's decision to include civilians Minnis and Powers in the search of Lamprey and of the Bellvilles' home. To the extent that the other claims were preserved with adequate objections to the magistrate judge's report, the district court's decision on those claims is summarily affirmed.

## II.

The appellants claim that Sergeant Lyver violated their Fourth Amendment rights by 1) allowing Minnis and Powers to participate in the searches without prior judicial authorization and 2) not adequately supervising Minnis during the search of the Bellvilles' home. The district court concluded that while "Sergeant Lyver violated the Plaintiffs' Fourth Amendment right to privacy by failing to obtain the clerk-magistrate's approval to utilize civilian's [sic] in conducting the searches and by not adequately limiting the role played by the civilians in the searches," he was entitled to immunity because that right was not clearly established at the time of the search.[4] We affirm the

---

[4]The district court adopted the magistrate judge's report and recommendations without comment; therefore, from this point forward, we will refer to the magistrate judge's report as the district court opinion.

district court judgment; however, we do so based on our conclusion that the appellants failed to establish a constitutional violation.

Normally, we endeavor to avoid deciding constitutional issues and attempt to decide cases on the narrowest grounds possible. That approach is not available here. In evaluating a claim of qualified immunity, the Supreme Court has told us that we must evaluate whether there was a constitutional violation before we address the other elements of a qualified immunity defense. See Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); Wilson v. Layne, 526 U.S. 603, 609 (1999) ("Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."). Therefore, we must evaluate whether Sergeant Lyver's inclusion of the 3-Com officials in the searches led to any Fourth Amendment violations.

## A. The District Court's Analysis

The district court relied on a decision of the Massachusetts Supreme Judicial Court (SJC), Commonwealth v. Sbordone, 678 N.E.2d 1184 (Mass. 1997), to conclude that Lyver violated the appellants' federal constitutional rights. In Sbordone, the defendant, a doctor, argued that the police officers'

use of a civilian investigator from the state insurance fraud office to assist with a search of his office violated his rights under Article 14 of the Massachusetts Constitution. According to the court, the officers claimed that they required the investigator's assistance because they did not have sufficient training to conduct the search effectively and because the investigator had significant experience with insurance fraud in general and with the defendant in particular. Id. at 1186. Although the state court orally authorized the investigator's presence when it issued the search warrant, it did not include that authorization in the warrant itself. The investigator helped the officers by sorting through files that were clearly labeled and alphabetized. The troopers reviewed the files that the investigator removed from the doctor's filing cabinets before they were seized.

After noting that the case was one of first impression, and that nothing in Massachusetts statutory or constitutional law forbade the police "from utilizing civilians in appropriate circumstances where such assistance is necessary or will materially assist the police in executing [the] warrant," id. at 1188 (internal quotation marks omitted), the SJC held that the investigator's participation in the search violated the defendant's state constitutional rights because the officers did not exercise sufficient control over his participation. The court reasoned that

-10-

officers are trained to conduct searches without violating state and federal law and face civil litigation and departmental discipline if they fail to do so. Civilians are not subject to the same controls; therefore, the court held that officers have an obligation to ensure that civilians do not exceed the lawful bounds of a warrant during a search. It added that "the required level of supervision varies depending on the circumstances." Id. at 1189. The court observed that the officers did not actually rely on the investigator's specialized knowledge during the search. Instead, they simply used him to conduct the "purely mechanical exercise of retrieving clearly labeled and alphabetically stored files based on names listed [in the warrant]." Id. at 1189 (internal quotation marks omitted). Given the circumstances, the SJC held that "the officers should have limited [the investigator's] role in the search to remaining present to assist the officers with any technical questions which may have arisen as the officers executed the warrant, particularly where the officers had ascertained the alphabetical filing system and had the cooperation of clinic employees." Id. The court also noted that the "better practice" when civilians are included in searches is to have the warrant indicate that the magistrate judge permitted this involvement, id. at 1188 n.9; however, it did not hold that such permission was constitutionally necessary.

-11-

The states, of course, are free to accord their citizens rights beyond those guaranteed by federal law.  See, e.g., Commonwealth v. Gonsalvez, 711 N.E.2d 108, 115 (Mass. 1999) (holding that Article 14 of the Massachusetts Constitution gives drivers the right to be free from unjustified automobile searches even though such rights are not guaranteed by the Fourth Amendment); Honorable Chief Justice Herbert P. Wilkins, Remarks of Chief Justice Herbert P. Wilkins to Students at New England School of Law on March 27, 1997, 31 New Eng. L. Rev. 1205, 1213 (1997) ("I think of the Supreme Court as describing a common base from which we can go up.").[5]  A showing that state law forbids a practice may

_____

[5]Article 14 of the Massachusetts Constitution is similar but not identical to the Fourth Amendment to the United States Constitution.  The state provision declares:

> Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

be insufficient to demonstrate that the practice violated the federal rights that are at issue in a section 1983 action. See, e.g., Martinez v. City of Schenectady, 115 F.3d 111, 116 (2d Cir. 1997) ("[T]hat the warrant was issued in contravention of the New York State Constitution . . . is an entirely different question from the issue whether it was objectively reasonable for the officers to believe they were violating clearly established federal rights."). Therefore, we must evaluate the district court's finding of a federal constitutional violation in light of other precedents.

## B. Executing the Search Warrants

The Supreme Court has held that the Fourth Amendment's prohibition of unreasonable searches and seizures extends not only to the initiation of searches but also to the manner in which searches are conducted. See, e.g., United States v. Ramirez, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant.") (citation omitted); Dalia v. United States, 441 U.S. 238, 257 (1979) ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant-- subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.'") (footnote omitted).

seized.

Since the appellants are challenging Sergeant Lyver's execution of the warrants to search Lamprey's office and the Bellvilles' home with the help of civilians, we begin our analysis by evaluating whether Powers' and Minnis' presence during the search was constitutionally justified at all, even though the appellants did not directly challenge their presence. We will then use that evaluation to help guide the rest of our analysis.

## C. Participation of Lyver and Minnis in the Searches

Federal constitutional law does not proscribe the use of civilians in searches. In fact, Congress has explicitly authorized the practice, see 18 U.S.C. § 3105 ("A search warrant may in all cases be served by any of the officers mentioned in its direction . . ., but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."), and courts have repeatedly upheld the practice. See, e.g., Bills v. Aseltine, 958 F.2d 697, 706 (6th Cir. 1992) ("Police may constitutionally call upon private citizens to assist them, and where assistance is rendered in aid of a warrant . . . the bounds of reasonableness have not been overstepped."); United States v. Clouston, 623 F.2d 485, 486-87 (6th Cir. 1980) (upholding search in which federal agents brought telephone company employees with them on a search to identify stolen property). Courts have articulated guidelines for evaluating police involvement of citizens in searches under the Fourth Amendment's reasonableness standard. The

-14-

civilian must have been serving a legitimate investigative function. It is impermissible, for example, for a civilian to "ride along" with officers in furtherance of his own private interest. See Wilson, 526 U.S. at 613-14 (holding that officers violated a defendant's Fourth Amendment rights by inviting a news crew along on a search); Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir. 1995) ("[W]e have no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not 'reasonable.'"); Bills, 958 F.2d at 702 (suppressing evidence discovered by a security guard who "was present, not in aid of the officers or their mission, but for his own purposes involving the recovery of . . . property not mentioned in any warrant"). Also, the officers must have some demonstrable need for the presence of the civilian. United States v. Sparks, 265 F.3d 826, 832 (9th Cir. 2001) ("Police cannot invite civilians to perform searches on a whim; there must be some reason why a law enforcement officer cannot himself conduct the search and some reason to believe that postponing the search until an officer is available might raise a safety risk.").

The record demonstrates that Sergeant Lyver requested assistance from Powers and Minnis because he felt that he did not have the necessary technical expertise to conduct the search on his

-15-

own and because he believed that the 3-Com officials would be able to help him identify the items that belonged to the company. See Wilson, 526 U.S. at 611-12 ("Where the police enter a home under the authority of a warrant to search for stolen property, the presence of third parties for the purpose of identifying the stolen property has long been approved by this Court and our common-law tradition."); Sparks, 265 F.3d at 831 ("'Where the civilian participating in the execution of a search warrant is the victim of a theft who has been requested by police to point out property that has been stolen from the victim, the courts have unanimously held that the civilian's presence did not affect the propriety of the search.'") (quoting Diane Schmauder Kane, Civilian Participation in Execution of Search Warrant as Affecting Legality of Search, 68 A.L.R.5th 549, § 3(b) (1999)). There is no indication that Powers and Minnis participated in the searches to further their own personal ends, nor is there a suggestion in the record that Sergeant Lyver could have delayed his search and obtained the necessary technical assistance from another officer. Knowing that Bellville had uncovered the investigation, Sergeant Lyver reasonably could have suspected that Bellville would have disposed of the 3-Com equipment if the search were delayed. Accordingly, we conclude that the civilian participation in the searches was reasonable.

## D.  Lack of Prior Judicial Approval

The district court cited no authority for its conclusion that the failure to obtain prior judicial approval for civilian assistance violates federal constitutional law.  Appellants cite no authority on appeal.  We have found none in our own research.  In the absence of any authority, we will not improvise a rule that seems unnecessary in light of the overarching requirement that the use of civilians in the execution of a search must still meet the constitutional standard of reasonableness.  With that requirement in mind, we echo the Sbordone court's cautionary note that it might be a "better practice," if circumstances permit, for law enforcement officers to disclose to the magistrate that civilians will be involved in the execution of the search and for the warrant to indicate that the magistrate permitted this involvement.  Such civilian involvement is certainly not the norm.  Prior disclosure and approval of that involvement might avoid the type of challenges we have in this case.

## E.  Lack of Supervision in Bellville's Home Office

The appellants also object to Sergeant Lyver's decision to allow Minnis to search Bellville's home office while he spoke with Bellville outside.  We begin our analysis by noting that "[t]he Fourth Amendment does not explicitly require official presence during a warrant's execution, therefore it is not an automatic violation if no officer is present during a search."

<u>United States</u> v. <u>Bach</u>, 310 F.3d 1063, 1066-67 (8th Cir. 2002). In fact, in some cases, searches conducted by technical experts outside of the view of the authorized police officer can actually reduce the intrusion on the defendant's privacy. <u>See, e.g.</u>, <u>id.</u>; <u>Rodrigues</u> v. <u>Furtado</u>, 575 N.E.2d 1124 (Mass. 1991) (concerning a search of the defendant's body). Therefore, we look at the specific circumstances of Minnis' search of Bellville's home office to see whether the degree of supervision exercised by Sergeant Lyver was unreasonable. <u>See</u> <u>Bell</u> v. <u>Wolfish</u>, 441 U.S. 520, 559 (1979).

Although the details of Minnis' search are sparse, Mrs. Bellville claims that she saw him "going through paperwork, going through [her] husband's file cabinets, looking through books, doing something on his computer, accessing it, looking at serial numbers and turning it over and stuff like that." Given the reason for Minnis' presence (to identify stolen items that Sergeant Lyver could not), that account does not describe anything that he would not have done if Sergeant Lyver had been in the room with him. He would still have taken the computers apart to see whether they were stolen from 3-Com, and he would have looked at the papers to see whether they contained the 3-Com trade secrets that Sergeant Lyver suspected Bellville of stealing. Unlike the situation in <u>Sbordone</u>, in which the civilian engaged in a "purely mechanical" exercise, Minnis relied on his technical expertise and familiarity with 3-Com

-18-

property during this search. Sergeant Lyver could not have supplanted his role if he had been in the room with Minnis. Moreover, Minnis did not search Bellville's home beyond the office, and there is no indication that he went beyond the bounds of the warrant. See Bach, 310 F.3d at 1067 ("If a practice substantially increase[s] the time required to conduct the search, thereby aggravating the intrusiveness of the search, then it may be reasonable to avoid that practice.") (internal quotation marks omitted); United States v. Heldt, 668 F.2d 1238, 1259 (D.C. Cir. 1981) ("[A] flagrant disregard for the limitations in a warrant might transform an otherwise valid search into a general one, thereby requiring the entire fruits of the search to be suppressed.").

In short, Sergeant Lyver's decision to question Bellville outside the home during Minnis' search of the home office did not result in a greater intrusion upon the Bellvilles' Fourth Amendment right to privacy. The degree of supervision that he exercised over Minnis during the search was not unreasonable. There was no violation of the appellants' Fourth Amendment rights.

**Affirmed.**