NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Carroll
No. 2018-0402

THE STATE OF NEW HAMPSHIRE

v.

CHRISTINA FAY

Argued: February 12, 2020
Opinion Issued: December 2, 2020

Gordon J. MacDonald, attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.

Lothstein Guerriero, PLLC, of Concord (Theodore Lothstein on the brief and orally), for the defendant.

HANTZ MARCONI, J. The defendant, Christina Fay, appeals her convictions on seventeen counts of cruelty to animals. See RSA 644:8 (2016) (amended 2018, 2019). The Wolfeboro Police Department executed a search warrant at the defendant's residence in June 2017 with the aid of the Humane Society of the United States (HSUS) and others, pursuant to which over seventy Great Danes were seized. The defendant argues that the Superior Court (Ignatius, J.) erred by denying her motion to suppress the evidence seized as a result of that search. We affirm.

The following relevant facts are drawn from the trial court's order on the defendant's suppression motion and the suppression record. See State v. Pseudae, 154 N.H. 196, 200 (2006). In 2017, the Wolfeboro Police Department was conducting an investigation of the defendant and her residence in Wolfeboro. During this time, two of the defendant's former employees provided information to the police. One employee informed the police that there were seventy-eight dogs living at the residence. She stated that the dogs rarely went outside and were not housebroken, and that the residence was covered in animal waste. She reported that the dogs only received water when they were let outside, but that it was not uncommon for the dogs to remain inside for an entire weekend. She also stated that the dogs were fed spoiled meat, and that many vomited often, were underweight, and had liquid stool. In addition, the employee stated that there were riding crops located throughout the house to break up fights among the dogs, and that one dog would bite anyone other than the defendant who got near it.

The defendant's other employee told the police that there was a thick layer of urine and feces covering the floors throughout the residence, and that there were maggots and bugs covering the floor where some of the dogs were living. This employee reported that the dogs were fed a diet of raw chicken that was prepared in unsanitary conditions, and that there were maggots in a box of chicken in the refrigerator. In addition to their eyewitness accounts, each employee provided the police with photographs of the inside of the residence. The photographs depicted "dogs with injuries," raw chicken meat, dog kennels in various parts of the house and garage, the floor covered in a brown substance resembling dog feces, and maggots in a refrigerator and on the ground.

Officer Strauch of the Wolfeboro Police Department, who led the department's investigation, visited the defendant's property in May to serve a civil dog nuisance summons. While there, Strauch observed a large number of dogs barking inside the residence, as well as strong odors of feces, urine, and "something rotting" coming from an open door along the side of the building. Strauch also saw several large dogs in kennels, the floors of which were "thick with feces." Veterinarians who examined dogs that had been rehomed by the defendant informed the police that the dogs were underweight and suffered from various diseases.

Strauch applied for and obtained a search warrant for the defendant's residence. However, the police department did not have the resources to transport, or provide shelter for, the roughly seventy-eight dogs they expected to recover from the residence. Strauch also testified that even if the dogs could be spread out among all of the animal shelters in the state, there was a risk that the dogs would spread disease to other animals in the shelters.

Conversely, HSUS had the resources to handle large-scale animal seizures, including access to large trailers with air conditioning to transport the dogs, and could provide them with adequate housing. Thus, Strauch asked the organization to assist with the execution of the search warrant. Strauch did not include in his affidavit supporting the search warrant's issuance that HSUS would be assisting the police, and the warrant itself did not explicitly state that HSUS was permitted to assist in its execution.

Strauch, along with every member of the police department, the Wolfeboro Fire Department, members of the ambulance team, employees from other town agencies, and staff from HSUS and the Pope Memorial SPCA, executed the warrant on June 16, 2017. Even with the number of persons assisting, Strauch testified that it took the entire day to execute the warrant. HSUS assisted with seizing and inventorying all of the dogs, and with evidence collection. Specifically, HSUS kept track of each dog, took photographs of where the dogs were kept, recorded videos, made a map of the rooms, photographed the dogs exiting the residence, and placed them in crates and into HSUS trailers for transportation. HSUS took possession of the dogs after they were removed from the house, providing them with housing and food at the organization's expense. HSUS later publicized its involvement in the search, as well as photographs from the search, in connection with fundraising efforts.

The defendant moved to suppress the evidence seized as a result of the search, arguing, among other things, that HSUS's involvement violated her right to be free from unreasonable searches and seizures. After a hearing, the trial court denied the defendant's motion. The defendant was subsequently brought to trial on eighteen counts of cruelty to animals.[1] See RSA 644:8, III. The State entered a nolle prosequi on one count during trial, and a jury convicted the defendant on the remaining seventeen counts. This appeal followed.

II

On appeal, the defendant argues that the trial court erred in denying her motion to suppress. When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. State v. Folds, 172 N.H. 513, 516 (2019). Our review of the trial court's legal conclusions, however, is de novo. Id. The defendant raises arguments under both the State and Federal Constitutions. We first address her arguments under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

---

[1] The dogs remained in HSUS's care throughout the defendant's trial.

The defendant contends that the trial court erred in denying her motion to suppress because the State violated two of her constitutional rights: her right to be free from unreasonable searches and seizures and her right to privacy. We begin with the defendant's argument regarding her right to privacy.

We understand the defendant to ground her right-to-privacy argument in the recently enacted amendment to our State Constitution, Part I, Article 2-b. N.H. CONST. pt. I, art. 2-b (effective December 5, 2018). To the extent the defendant argues that, irrespective of the enactment of Part I, Article 2-b, her right to privacy, under the State and Federal Constitutions, was violated by, inter alia, HSUS's involvement in executing the search of her home and its subsequent "media and fundraising campaign," she failed to raise any right-to-privacy argument to the trial court, and we decline to consider any such arguments on appeal. See State v. Blackmer, 149 N.H. 47, 48 (2003). Accordingly, we limit our review of her right-to-privacy argument to Part I, Article 2-b of the State Constitution.

The defendant argues that Part I, Article 2-b, which was enacted after the relevant events in her case, applies to her case retroactively. We have not had occasion to decide the proper means of determining whether a constitutional amendment has retroactive effect. Cf., e.g., State v. Brawley, 171 N.H. 333, 341 (2018) (analyzing retroactivity of newly enacted legislation); State v. Tierney, 150 N.H. 339, 342-45 (2003) (analyzing retroactivity of new constitutional rules announced by judicial decision). The defendant asserts that "[t]hree considerations compel the conclusion that [Part I,] Article 2-b applies to this case."

The first consideration she raises is, "The language of the amendment supports a finding of retroactive application." Part I, Article 2-b states, "An individual's right to live free from governmental intrusion in private or personal information is natural, essential, and inherent." N.H. CONST. pt. I, art. 2-b. The defendant acknowledges that "the amendment does not expressly address the issue of retroactive application," but points to the language "natural, essential, and inherent" as indicative of "[t]he choice by the citizens to characterize the right to privacy as pre-existing rather than newly-created." (Citing Burrows v. City of Keene, 121 N.H. 590, 596 (1981) (explaining that the phrase "natural, essential, and inherent" in Part I, Article 2 demonstrates that the rights articulated "are not bestowed by that constitutional provision but rather are recognized to be among the natural and inherent rights of all humankind")). Consequently, she argues, the use of the phrase "natural, essential, and inherent" also "manifests the[] intent to apply the amendment retroactively."

The general rule employed by a majority of jurisdictions presumes that constitutional amendments operate prospectively unless the intent to apply the

4

amendment retroactively is clear.  See, e.g., Evans v. Utah, 21 F. Supp. 3d 1192, 1204-05 (D.Utah 2014) (applying Utah law); State v. Merritt, 467 S.W.3d 808, 812 (Mo. 2015) (per curiam); People v. Dean, 677 N.E.2d 947, 952 (Ill. 1997); Kneip v. Herseth, 214 N.W.2d 93, 101-02 (S.D. 1974); see also 16 C.J.S. Constitutional Law § 116, Westlaw (database updated Sept. 2020); 16 Am. Jur. 2d Constitutional Law § 50, Westlaw (database updated Nov. 2020).  "The presumption against retroactive application of changes in the law is deeply rooted in principles of fairness and due process."  Evans, 21 F. Supp. 3d at 1204; see, e.g., Shreveport v. Cole, 129 U.S. 36, 42-43 (1889).  "[T]he 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'"  Landgraf v. USI Film Products, 511 U.S. 244, 265 (1994) (quoting Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)).

Presuming that constitutional amendments apply prospectively is abundantly justifiable, and we hereby adopt such a presumption.  Our presumption that constitutional amendments apply prospectively may be rebutted by the clear manifestation of intent to apply the amendment retroactively.

Turning to Part I, Article 2-b, we conclude that the phrase "natural, essential, and inherent" is ambiguous, at best, as to whether it manifests an intent to have the amendment apply retroactively.[2]  See N.H. CONST. pt. I, art. 2-b.  This ambiguity is insufficient to overcome the presumption of prospective application.  See, e.g., Evans, 21 F. Supp. 3d at 1205 ("[T]he use of present and future tenses in [a constitutional amendment or statute] does not provide a clear and unavoidable implication that they operate on events already past." (quotation omitted)).  See generally 16 Am. Jur. 2d Constitutional Law § 50 ("[T]he general rule is that prospective effect alone is given to provisions of state constitutions, unless a contrary intention is clearly expressed. . . . In fact, constitutional amendments apply only prospectively in all but the most extraordinary circumstances." (footnotes omitted)).  We are, thus, unpersuaded that the defendant's first consideration compels the application of Part I, Article 2-b to her case.

The second consideration raised by the defendant is that "under a long-standing principle recognized under both state and federal constitutional law,

---

[2] We are not persuaded by the defendant's reasoning that, because the phrase "natural, essential, and inherent" in Part I, Article 2-b demonstrates an intent "to characterize the right to privacy as pre-existing rather than newly-created," it also demonstrates an intent to apply the amendment retroactively.  Even assuming an amendment to the State Constitution explicitly created a new right, it does not follow that the amendment could not also be deemed to overcome the presumption of prospective application through, for example, "an express retroactivity provision in the actual language of the amendment or extrinsic sources that leave no doubt that such was the voters' manifest intent."  16 Am. Jur. 2d Constitutional Law § 50.

new constitutional rules apply retroactively to all case[s] pending and on direct review when the new rule is announced." Because this case was on direct review when Part I, Article 2-b was enacted, the defendant reasons that Article 2-b applies to her case. The support for this argument is limited to citations to two cases: Teague v. Lane, 489 U.S. 288 (1989), and our decision in Tierney. However, neither case analyzed whether a constitutional amendment has retroactive effect. See Teague, 489 U.S. at 294-96 (analyzing, for cases on collateral review, whether the new constitutional rule articulating the evidentiary showing necessary to make out a prima facie case of racial discrimination based upon the manner in which the prosecution uses peremptory challenges, as announced in Batson v. Kentucky, 476 U.S. 79, 96-98 (1986), had retroactive effect); Tierney, 150 N.H. at 342-45 (analyzing, for cases on direct review, whether the new constitutional rule articulating "the absolute right to sever unrelated cases," as announced in State v. Ramos, 149 N.H. 118, 127 (2003), had retroactive effect). Retroactivity, as contemplated in Teague and Tierney, was limited to cases pending on direct appeal, the status of which was relevant because the constitutional rule at issue had been announced by judicial decision. See Tierney, 150 N.H. at 343-44 ("It hardly comports with the ideal of administration of justice with an even hand, when one chance beneficiary—the lucky individual whose case was chosen as the occasion for announcing the new principle—enjoys retroactive application, while others similarly situated have their claims adjudicated under the old doctrine." (brackets omitted) (quoting Griffith v. Kentucky, 479 U.S. 314, 327-28 (1987)); see also Teague, 489 U.S. at 295-96 ("Petitioner's conviction became final 2½ years prior to Batson, thus depriving petitioner of any benefit from the rule announced in that case.").

However, whether a defendant's case is pending on appeal has no bearing on whether an amendment to the State Constitution was intended to apply retroactively. Accord Merritt, 467 S.W.3d at 812 (rejecting a similar argument — that a constitutional amendment, enacted when defendant's case was not yet final, applied retroactively — explaining that defendant's reliance on Griffith was misplaced because it only governed the retroactivity of "newly stated procedural rules of federal constitutional law"). We are, thus, unpersuaded that the defendant's second consideration compels the application of Part I, Article 2-b to her case.

The third consideration raised by the defendant is that "consideration of this new enactment by the people of our State is unavoidable in determining the contours and limits of what places, effects, and personal information the people reasonably expect to remain private," i.e., a defendant's reasonable expectation of privacy under Part I, Article 19. Even assuming without deciding that we agree that analyzing whether a defendant had a reasonable expectation of privacy under Part I, Article 19 necessitates an analysis of Part I, Article 2-b, it is undisputed that the defendant's case does not implicate an examination of her reasonable expectation of privacy. See State v. Schulz, 164

6

N.H. 217, 225 (2012) ("[T]he reasonableness of a search conducted pursuant to a warrant is a distinct constitutional inquiry from the question of whether a warrant is required in the first place."); see also, e.g., State v. Orde, 161 N.H. 260, 267 (2010) (reasoning that "[b]ecause the defendant had a reasonable expectation of privacy in his deck, a warrant or an exception to the warrant requirement was needed for the officer to lawfully enter the defendant's deck").

Furthermore, again assuming without deciding that, looking forward, an analysis of a defendant's reasonable expectation of privacy under Part I, Article 19 will necessitate the contemplation of Part I, Article 2-b, the existence of such a prospective implication does not speak to whether Part I, Article 2-b was intended to apply retroactively. See, e.g., Kneip, 214 N.W.2d at 101 ("It is the general rule, and settled law in South Dakota, that a constitutional provision should not be construed to have retroactive effect unless such intention is clearly expressed."); see also Landgraf, 511 U.S. at 265. We are, thus, unpersuaded that the defendant's third consideration compels the application of Part I, Article 2-b to her case.

Ultimately, we are not convinced by the defendant's arguments that Part I, Article 2-b applies retroactively to her case. Therefore, we need not address her remaining arguments pertaining to Part I, Article 2-b. We conclude that the defendant has not demonstrated that her right to privacy was violated.

III

We now turn to the defendant's argument that the State violated her right to be free from unreasonable searches and seizures. Part I, Article 19 of the New Hampshire Constitution protects all people, their papers, their possessions, and their homes from unreasonable searches and seizures. Folds, 172 N.H. at 516-17; see N.H. CONST. pt. I, art. 19. There are several constitutional requirements for the issuance and execution of search warrants. See Folds, 172 N.H. at 520; Schulz, 164 N.H. at 221. For example, search warrants "must be sufficiently particular and must be supported by a finding of probable cause." Schulz, 164 N.H. at 221; see Folds, 172 N.H. at 520; Orde, 161 N.H. at 269. In addition, even if a warrant satisfies the particularity and probable cause requirements, "the manner of its execution must in other respects be reasonable." Schulz, 164 N.H. at 221; see also United States v. Ramirez, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." (citation omitted)). The defendant contends that the State "violated the requirement that the manner of [the warrant's] execution be reasonable" by failing to obtain, prior to the warrant's execution, judicial authorization for the involvement of HSUS, a private organization.

We have not previously considered the extent to which it is constitutionally reasonable for the police to involve civilians when executing

7

search warrants. We begin our analysis by noting that "[f]ederal constitutional law does not proscribe the use of civilians in searches. In fact, Congress has explicitly authorized the practice, and courts have repeatedly upheld the practice." Bellville v. Town of Northboro, 375 F.3d 25, 32 (1st Cir. 2004) (citation omitted); see 18 U.S.C. § 3105 (2018) ("A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."). In New Hampshire, RSA 595-A:8 states: "An officer executing a search warrant may take with him suitable assistants and suffer no others be with him." RSA 595-A:8 (2001). Thus, the New Hampshire Legislature, in a manner similar to Congress, has authorized officers executing search warrants to take with them "suitable assistants." Id.; see Bellville, 375 F.3d at 32.

That civilian accompaniment is not flatly barred, as a matter of constitutional or statutory law, when executing a search warrant does not end our inquiry, of course, for such accompaniment will not be reasonable in every case. See, e.g., Richards v. Wisconsin, 520 U.S. 385, 394 (1997) (reasonableness of manner in which searches are conducted must be judged on case-by-case basis). To that end, "[c]ourts have articulated guidelines for evaluating police involvement of citizens in searches under the Fourth Amendment's reasonableness standard." Bellville, 375 F.3d at 33. In Wilson v. Layne, 526 U.S. 603 (1999), the United States Supreme Court held that "it is a violation of the Fourth Amendment for police to bring . . . third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." Wilson, 526 U.S. at 614. It was undisputed in Wilson that the civilians who accompanied the officers — newspaper reporters — did not assist the police in executing the warrant. See id. at 607, 611. The reporters were merely brought along "as part of a . . . ride-along policy." Id. at 607.

Wilson stands for the proposition that it is constitutionally unreasonable for the police to bring civilians into a home when executing a warrant when the involvement of the civilians does not aid in the execution of the warrant. See id. at 614. "Police cannot invite civilians to perform searches on a whim . . . ." United States v. Sparks, 265 F.3d 825, 832 (9th Cir. 2001), overruled on other grounds by United States v. Grisel, 488 F.3d 844 (9th Cir. 2007). "[W]here [civilian] assistance is rendered in aid of a warrant," however, the civilian involvement tends to be within "the bounds of reasonableness." Bills v. Aseltine, 958 F.2d 697, 706 (6th Cir. 1992); see also Bellville, 375 F.3d at 33 (stating that, for civilian involvement to be reasonable, "[t]he civilian must have been serving a legitimate investigative function," and "the officers must have some demonstrable need for the presence of the civilian"). In fact, "[c]ivilian searches are sometimes more reasonable than searches by officers." United States v. Bach, 310 F.3d 1063, 1067 (8th Cir. 2002). For example, "a civilian may possess a peculiar expertise or knowledge regarding the means of retrieval

8

or identification of items covered by a warrant, and . . . permitting civilian assistance in such circumstances [may] actually enhance[] the reasonableness of the search by lessening its intrusiveness." Com. v. Sbordone, 678 N.E.2d 1184, 1188 (Mass. 1997); see also Schalk v. State, 767 S.W.2d 441, 445, 453-54 (Tex. Crim. App. 1988) (explaining that, where officer did not have specialized knowledge to distinguish computer files covered by warrant from files not covered, "use of [civilian] assistance . . . would tend to limit or restrict the items seized rather than enlarge upon them"); State v. Kern, 914 P.2d 114, 118 (Wash. Ct. App. 1996) (noting that "police officer[s] will not ordinarily perform a search of a bank's records, indeed may not be qualified to do so," and that "[w]here a warrant is issued for specific bank records, delegation of the search to bank employees is not improper").

Here, the defendant does not dispute that the police required assistance to execute the search warrant for her residence and to care for the dogs seized. Nor does the defendant dispute that the police required the assistance of an organization such as HSUS. Instead, the defendant argues that Strauch's failure to obtain express authorization for HSUS's aid from the magistrate who issued the search warrant was constitutionally unreasonable. We do not agree.

The defendant has cited no instance in which a court has held that the failure to obtain express judicial authorization for citizen aid prior to the execution of a warrant rendered the subsequent search unconstitutional. We have found no instance in our own research. Although some courts have opined "that it might be a 'better practice,' if circumstances permit, for law enforcement officers to disclose to the magistrate that civilians will be involved in the execution of the search and for the warrant to indicate that the magistrate permitted this involvement," Bellville, 375 F.3d at 33-34; accord Sbordone, 678 N.E.2d at 1188 n.9, "there appears to be no authority indicating that a failure to follow such a procedure violates the Fourth Amendment," 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.10(d), at 979 (5th ed. 2012).

Recognizing this dearth of authority from outside New Hampshire, the defendant argues that prior judicial authorization for citizen involvement is, or ought to be, required under Part I, Article 19 of the State Constitution. The defendant relies upon prior cases in which we have held that Part I, Article 19 provides greater protections than does the Fourth Amendment, and also upon the state constitutional preference "for favoring judicial oversight rather than deferring to the discretion of the police officer."[3]

---

[3] To the extent the defendant asserts additional points in support of her position that HSUS's involvement in this case, including the organization's post-search publicization efforts, violated Part I, Article 19's mandate that search warrants be executed in a reasonable manner, those assertions are unsupported by citation to authority and are insufficiently developed. See Blackmer, 149 N.H. at 49 ("[A] mere laundry list of complaints . . . , without developed legal argument, is insufficient to warrant judicial review." (quotation omitted)).

We see no reason to create a new constitutional rule in this case, especially one that is "unnecessary in light of the overarching requirement that the use of civilians in the execution of a search must still meet the constitutional standard of reasonableness." Bellville, 375 F.3d at 33. Regardless of whether the issuing magistrate expressly authorizes the civilian's participation at the time of the warrant's issuance, the civilian's participation is subject to later judicial scrutiny in reviewing the reasonableness of the warrant's execution. See Dalia v. United States, 441 U.S. 238, 258 (1979).

Moreover, we fail to see how civilian involvement that is reasonable at the time of the warrant's execution would somehow become unreasonable because the officers intended to utilize civilian aid when they acquired the warrant but did not obtain the magistrate's express authorization to do so. See United States v. Boulanger, 444 F.3d 76, 83-84 (1st Cir. 2006); see also State v. Henderson, 629 N.W.2d 613, 621 (Wis. 2001) ("[T]he manner in which a search warrant is executed . . . does not require prior judicial authorization."). The pertinent inquiry under Part I, Article 19 is whether the manner of the warrant's execution was reasonable. See Schulz, 164 N.H. at 221. A conclusion that the search warrant for the defendant's home was executed unreasonably because of conduct that occurred prior to its execution is inconsistent with the nature of this inquiry. See id.; see also Boulanger, 444 F.3d at 83 (explaining that, because the rule that officers knock and announce their presence when executing a warrant "falls under the Fourth Amendment's reasonableness clause, as opposed to its warrant clause[,] . . . the reasonableness of a police officer's decision to conduct a no-knock entry 'must be evaluated as of the time they [conduct the entry].'" (alteration in original) (citation omitted) (quoting Richards, 520 U.S. at 395)); cf. Schulz, 164 N.H. at 225 ("[T]he reasonableness of a search conducted pursuant to a warrant is a distinct constitutional inquiry from the question of whether a warrant is required in the first place."). Such a conclusion would fundamentally alter the reasonableness inquiry by moving its focus back in time to when the officers obtained the warrant, and would require analysis of the reasonableness of pre-execution conduct. See Boulanger, 444 F.3d at 83-84. Because the pertinent analysis under Part I, Article 19 is whether "the manner of [the warrant's] execution . . . [was] reasonable," Schulz, 164 N.H. at 221, we cannot conclude, from the fact that Strauch did not obtain prior judicial authorization for HSUS's participation in executing the warrant, that the manner of the warrant's execution was unconstitutional.

We agree with the United States Court of Appeals for the First Circuit and the Supreme Judicial Court of Massachusetts, however, that it may be wise for officers to notify the issuing magistrate of the fact that civilians will assist in a warrant's execution, when it is possible to do so. See Bellville, 375 F.3d at 33-34; Sbordone, 678 N.E.2d at 1188 n.9. Indeed, "[p]rior disclosure and approval of that involvement might avoid the type of challenges we have in this case." Bellville, 375 F.3d at 34. That said, for the reasons discussed

10

above, such disclosure and approval are not prerequisites to the civilians' assistance under Part I, Article 19's reasonableness requirement.

In summation, we conclude that the State did not violate Part I, Article 19's requirement that the manner of a search warrant's execution be reasonable by failing to obtain authorization for HSUS's involvement prior to the warrant's execution. As the State Constitution is at least as protective as the Federal Constitution in these circumstances, we further conclude that the State did not violate the Fourth Amendment's reasonableness requirement. See Schulz, 164 N.H. at 221; Bellville, 375 F.3d at 33-34. Additionally, the defendant has failed to demonstrate that her right to privacy was violated. Because we have concluded that a constitutional violation did not occur, we need not address the defendant's arguments regarding whether suppression of the evidence obtained from the search would be an appropriate remedy for such a violation.

Affirmed.


HICKS, BASSETT, and DONOVAN, JJ., concurred.